IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CYNTHIA L. EMRICH,              )
                                )
            Plaintiff,          )
                                )
      v.                        )     1:13cv1012
                                )
CAROLYN W. COLVIN,              )
Acting Commissioner of Social   )
Security,                       )
                                )
            Defendant.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Plaintiff Cynthia Emrich brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits.  The parties have filed cross-motions for judgment.  (Docs. 16, 18.)  For the reasons set forth below, Emrich's motion will be denied, the Commissioner's motion will be granted, and the case will be dismissed.

## I.   BACKGROUND

Emrich filed her application for disability insurance benefits ("DIB") on June 23, 2009, claiming a period of disability commencing on January 1, 2003, and ending on December 31, 2005, the date she was last insured. (Tr. at 298–

305.)[1]  Her application was denied initially and again upon reconsideration.  (Id. at 159–60.)  Thereafter, Emrich requested a de novo hearing on her claim before an administrative law judge ("ALJ").  (Id. at 164.)  On March 25, 2011, Emrich appeared at the requested hearing *pro se*, and the ALJ granted a continuance to give Emrich an opportunity to obtain counsel. (Id. at 122–57, 164).

On July 5, 2011, Emrich and her non-attorney representative appeared before the same ALJ for a hearing.  (Id. at 96–121.) The ALJ ultimately issued a decision finding Emrich not disabled.  (Id. at 164–71.)  Emrich appealed to the Appeals Council, which, on December 26, 2012, remanded the case for a new hearing for further consideration of several issues not before this court.  (Id. at 177–79.)

Accordingly, on March 22, 2013, Emrich appeared with her non-attorney representative and testified at a third hearing. (Id. at 55–95.)  Following that hearing, the ALJ once again found Emrich not disabled between her alleged onset date and December 31, 2005, her date last insured.  (Id. at 46–47.) Emrich again appealed the decision.  On September 13, 2013, the Appeals Council denied review, thereby rendering the ALJ's decision the Commissioner's final decision for purposes of

---

[1] Transcript citations refer to the Sealed Administrative Transcript of Record (Docs. 11–13).

judicial review.  (Id. at 7–11.)

Emrich filed her complaint with this court on November 14, 2013, seeking review of the Commissioner's decision.  Emrich has filed a motion for judgment reversing the Commissioner, or alternatively remanding for rehearing.  (Doc. 16.)  The Commissioner has not responded but has filed a motion for judgment on the pleadings, to which Emrich did not respond. (Doc. 18.)  The time for further briefing has passed, and the motions are now ripe for resolution.

## II.  ANALYSIS

### A.    Standard of Review

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such an administrative] decision . . . is extremely limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (citations omitted) (internal brackets omitted). "Substantial evidence means 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "[I]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)) (internal brackets omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner or the ALJ]." Hancock, 667 F.3d at 472 (quoting Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005)). The issue before this court, therefore, "is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial

evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589.

In administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423 (d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

Id. The claimant bears the burden as to the first four steps,

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

but the Commissioner bears the burden as to the fifth step.  Id. at 472–73.

In undertaking this sequential evaluation process, the five steps are considered sequentially, although a finding adverse to the claimant at either of the first two steps forecloses a disability designation and ends the inquiry.  In this regard, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.'  If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

If a claimant carries his burden at each of the first two steps and also meets his burden at step three of establishing an impairment that meets or equals an impairment listed in the regulations, the claimant is disabled, and there is no need to proceed to step four or five.  See Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then the analysis continues and the ALJ must assess the claimant's residual functional capacity ("RFC").[3]  Id. at 179.

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work

Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179–80. However, if the claimant establishes an inability to return to prior work based on that RFC, the analysis proceeds to the fifth step, which shifts the burden of proof and "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264–65. If, at this step, the Commissioner cannot carry her "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

---

setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562–63.

**B.  Emrich's Challenges**

In the present case, the ALJ found that Emrich had not engaged in "substantial gainful activity" since her alleged onset date.  Emrich thus met her burden at step one of the sequential evaluation process.  (Tr. at 37.)  At step two, the ALJ determined that Emrich suffered from the following severe impairments through her date last insured:  hepatitis C, bunions of both feet, ankle instability, obesity, opiate dependence in remission, panic attacks, and agoraphobia.  The ALJ found at step three that these impairments did not meet or equal a disability listing.  (Id. at 38.)

Therefore, the ALJ assessed Emrich's RFC and determined that Emrich could perform light work as defined in 20 C.F.R. § 404.1567(b) with further limitations to unskilled, simple, and routine tasks, working primarily with things and not people, and limited public contact.  (Id. at 39.)  At step four of the analysis, the ALJ determined that Emrich could not perform relevant past work with her current RFC.  (Id. at 45.)  However, based on the testimony of a vocational expert, the ALJ concluded at step five that Emrich could perform other jobs that exist in significant numbers in the national economy.  (Id. at 45–47.)  Therefore, the ALJ concluded that Emrich was not disabled within the meaning of the Act.  (Id. at 46–47.)

Before this court, Emrich raises several challenges to the

ALJ's decision. Two of these challenges involve the potential implications of evidence that arose between Emrich's date last insured ("DLI"), December 31, 2005, and her two hearings more than six to eight years later. In particular, Emrich contends that the ALJ failed to (1) give retrospective consideration to post-DLI evidence and have a medical advisor help determine the date of disability onset, and (2) properly consider the opinion evidence offered by Dr. Sam Fulp, Emrich's hepatologist since 2008. (Doc. 17 at 1–2.) In addition to this post-DLI evidence, Emrich argues the ALJ erred by failing to consider her many global assessment of functioning (GAF) scores as medical opinion evidence.

### 1. Post-DLI Evidence

Emrich first claims that the ALJ erred by failing to give retrospective consideration to medical evidence created after Emrich's DLI. Citing Bird v. Commissioner of Social Security Administration, 699 F.3d 337, 340–41 (4th Cir. 2012), Emrich correctly notes that, in some instances, medical evidence that post-dates a claimant's DLI may be considered where it is relevant to prove disability prior to that date. Specifically, the Fourth Circuit held in Bird "that post-DLI medical evidence generally is admissible in an SSA [Social Security Administration] disability determination in such instances in which that evidence permits an inference of linkage with the

claimant's pre-DLI condition." 669 F.3d at 341 (citing Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)). In the case of medical opinions, the evidence in question "must relate back to the relevant period" and "offer a retrospective opinion on the past extent of an impairment"; but, to permit an inference of linkage, the opinions must not be dated "long after" the DLI or be contradicted by other opinions from the relevant period. Brown v. Astrue, No. 8:11-03151, 2013 WL 625599, at *15 (D.S.C. Jan. 31, 2013).

Emrich now contends that her more recent medical evidence effectively links her later symptoms to her pre-DLI condition, mandating its consideration. Emrich's analysis of this issue, however, is totally conclusory. Emrich has cited to over 700 pages of the administrative record, which, she asserts, supports her argument under Bird:

> In this case the ALJ should have given retrospective consideration to much of the medical evidence created after the DLI including, but not limited to, Dr. Young's records and opinions (Tr. 535-542, 666-672, 707-714, 783-819, 1163-1191, 1244-1276), Dr. Fulp's and his practices['] treatment records and opinions (Tr. 612-637, 683-739, 763-782, 820-882, 1192-1243, 1298-1299), Southeast Pain Care['s] records (Tr. 543-569, 678-680, 715-762, 1033-1082, 1277-1297), Dr. McDuffy's treatment records and opinions (Tr. 673-677), OrthoCarolina['s] treatment records (Tr. 475-487), Gill Orthopaedic Clinic['s] records (Tr. 525-534), and First Care Medical Clinic['s] treatment records (Tr. 1083-1162). All of this evidence clearly permits an inference of linkage with Emrich's condition prior to the DLI and thus the [sic] appropriate for retrospective consideration.

> As the Court held in <u>Moore</u>, retrospective
> consideration of medical evidence is especially
> appropriate when corroborated by lay evidence. <u>See</u>
> <u>Moore</u>[<u>v. Finch</u>], 418 F.2d [1224,] 1226 [(4th Cir.
> 1969)]. Here, Emrich's testimony at all three ALJ
> hearings (Tr. 55-158) buttresses the medical evidence
> of Emrich's pre-DLI condition.

(Doc. 17 at 9.)

To substantiate this argument, Emrich was required to explain how a particular piece of evidence relates back to the pre-DLI period and offers a relevant, retrospective opinion on the extent of Emrich's pre-DLI conditions, while not being too dated or contradicted by contemporaneous evidence of Emrich's pre-DLI condition. Emrich's counsel made no attempt to do this. This court will not rummage through over half of the 1299-page administrative record to do the work that Emrich's counsel elected not to do. <u>Hayes v. Self-Help Credit Union</u>, No. 1:13-CV-880, 2014 WL 4198412, at *2 (M.D.N.C. Aug. 22, 2014); <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014). Such perfunctory arguments by attorneys violate the local rules of this district and fail to serve their clients' interests. As the Seventh Circuit has noted,

> District judges are not archaeologists. They need not
> excavate masses of papers in search of revealing
> tidbits — not only because the rules of procedure
> place the burden on the litigants, but also because
> their time is scarce. Other parties, who live by the
> rules, have a priority claim on the judge's attention.
> Lawyers and litigants who decide that they will play

by rules of their own invention will find that the
game cannot be won.

Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662–63 (7th Cir.
1994). Therefore, the court will not address Emrich's bare
assertions of support.

The court will, however, address Emrich's other argument
regarding post-DLI evidence, supported by at least some legal
analysis, that the ALJ should have appointed a medical advisor
to determine when Emrich's "disability" began. (Doc. 17 at 10.)
Although Emrich relies on Bird for support, she has misconstrued
that decision's holding.

In Bird, the Fourth Circuit considered a claimant's DIB
claim. The claimant did "not have any medical records dating
before his DLI." 699 F.3d at 339. The ALJ in that case refused
to consider retrospective medical records created after the DLI
that suggested the onset date of the claimant's PTSD condition
occurred before the DLI. Id. at 340. The court found this
decision by the ALJ to be error because the claimant's
retrospective, post-DLI evidence could have been the "most
cogent proof" of the claimant's pre-DLI condition. Id. at 341
(quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)).
Given the absence of pre-DLI evidence and the probative value of
post-DLI evidence, the circumstances in Bird were one of the
cases where "it may be possible, based on the medical

evidence[,] to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination." Id. at 344 (quoting SSR 83-20). In cases such as Bird, where there is an "ambiguous record," ALJs cannot make "negative inferences" regarding the date of onset, but must appoint a medical advisor, pursuant to SSR 83-20, to determine the date of onset. Id. at 345.

This case is not like Bird. There is substantial evidence in the record concerning Emrich's pre-DLI condition. It was not necessary for the ALJ to appoint a medical advisor because he had no need to make inferences about the date of onset; he was able to consider direct — not circumstantial — evidence of Emrich's pre-DLI condition. And again unlike in Bird, the ALJ did consider some retrospective evidence and found that it did not establish any post-DLI disability. (See, e.g., Tr. at 42 (discussing Emrich's demeanor at the 2013 and 2011 hearings before the ALJ); id. at 44 (discussing 2009 report from Emrich about her current function level); id. (discussing Emrich's failure to take physician's advice in 2006).)

True, the ALJ did give "little weight" to one piece of retrospective evidence, the opinion of Dr. Young, who gave an opinion about Emrich's depression condition as of April 2011, over five years after the DLI. (Id. at 44, 819.) But a linkage between Emrich's pre- and post-DLI depression conditions was

unnecessary because Emrich was treated for depression throughout her disability insurance coverage period, and the ALJ considered whether that direct evidence supported a finding of disability. (Id. at 42–44.) It was appropriate for the ALJ to give little weight to evidence of Emrich's depression condition five years after the DLI when he could consider direct, substantial evidence of Emrich's depression condition during the DIB coverage period.

This court's conclusion accords with that of other courts that have found Bird inapplicable where there was meaningful evidence of the claimant's disability vel non during the DIB coverage period. See Haila v. Colvin, No. 5:13CV377, 2014 WL 2475749, at *15 (N.D. Fla. June 3, 2014) ("Unlike the facts in Bird, there was sufficient medical evidence prior to the relevant time period of Plaintiff's claim for the ALJ to determine whether Plaintiff was disabled and the evidence after her date last insured did not establish she was disabled prior to this date. No error has been shown."); Booker v. Colvin, No. 1:13-CV-2033, 2014 WL 6816878, at *5 (D.S.C. Dec. 4, 2014) ("Unlike in Bird where there was no medical evidence prior to the claimant's date last insured, 699 F.3d at 339, here, the record before the ALJ included [pre-DLI] medical testimony, none of which indicated that Booker needed to keep his legs elevated."); Greifenstein v. Colvin, No. 2:13CV81, 2014 WL

198720, at *4 (E.D. Va. Jan. 15, 2014) ("Therefore, since the pre-DLI evidence actually weighs against any inference of linkage there was no error on the part of Magistrate Judge Miller in not remanding this case pursuant to Bird and Ladson.").

For these reasons, it was not error for the ALJ not to appoint a medical advisor.

### 2. Dr. Fulp's Opinions

Emrich also challenges the ALJ's treatment of two opinions rendered by Dr. Fulp, Emrich's hepatologist since 2008. Dr. Fulp completed a "Liver Disease Impairment Questionnaire" on May 6, 2011, more than five years after Emrich's DLI, in which he found that Emrich's hepatitis C caused anorexia and fatigue and limited her to sitting for four hours in an eight-hour workday and standing or walking for just one hour. (Tr. at 879–80.) The ALJ did not mention or assign weight to Dr. Fulp's findings in the 2011 questionnaire, which Emrich claims is reversible error. The Commissioner concedes that the ALJ erred in not considering the opinion, but argues the error was harmless.

Two years later, on April 9, 2013, Dr. Fulp wrote a brief opinion letter at Emrich's request, saying that Emrich "could have been disabled" due to depression as of January 1, 2003. (Id. at 1298.) The ALJ assigned little weight to Dr. Fulp's 2013 opinion. (Id. at 44.) Emrich argues that, as a treating

15

physician, Dr. Fulp's opinion was entitled to greater weight. The Commissioner points to substantial evidence supporting the weight assigned by the ALJ. The ALJ's consideration of each of Dr. Fulp's two opinions will be addressed separately.

### a. May 6, 2011 Opinion

Emrich argues that the ALJ erred in not explicitly considering and assigning weight to Dr. Fulp's 2011 opinion. The Commissioner concedes that the ALJ erred in not explicitly considering the opinion in the ALJ's decision, but that the error was harmless.

Assuming that it was error for the ALJ not to mention and assign weight to Dr. Fulp's 2011 opinion, the court agrees that such an error was harmless in this case. In social security cases, an ALJ's errors are harmless so long as the ALJ's conclusion is supported by substantial evidence in the record and the claimant could not reasonably have been prejudiced by the error. See Tanner v. Comm'r of Soc. Sec., No. 14-1272, 2015 WL 574222, at *5 (4th Cir. Feb. 12, 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-disability"); Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) ("[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." (quotation marks omitted)); Morgan

v. Barnhart, 142 F. App'x 716, 723 (4th Cir. 2005); Dyrda v. Colvin, No. 1:13CV609, ___ F. Supp. 3d ___, 2014 WL 4685393, at *6 (M.D.N.C. Sept. 19, 2014); Huffman v. Colvin, No. 1:10CV537, 2013 WL 4431964, at *4 (M.D.N.C. Aug. 14, 2013) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error."); cf. Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

In this case, Dr. Fulp's opinion, expressed in the liver disease impairment questionnaire, does not suggest any linkage between Emrich's liver condition in 2011 and her pre-DLI condition five years earlier.[4] When asked on the final page of the questionnaire for "the earliest date that the description of symptoms and limitations in this questionnaire applies," Dr. Fulp provided no answer. (Tr. at 882.) In fact, he filled out only a small fraction of the six-page form. Notably, Dr. Fulp rendered his opinion as to Emrich's sitting, standing, and walking limitations as of April 25, 2011, the date of her most

---

[4] The Commissioner also contends that Dr. Fulp's opinion is inconsistent with his own treatment notes and other substantial evidence. (Doc. 19 at 18.) The court need not reach this additional basis for finding harmlessness.

recent exam, but left the rest of the questions regarding
Emrich's functional limitations conspicuously blank, including
questions regarding the impact of Emrich's fatigue, which he
explicitly identified as a primary symptom. (Id. at 877–82.)
In short, the 2011 liver questionnaire fails to provide any
evidence relevant to the issue at hand, that is, whether Emrich
became disabled prior to the expiration of her insured status on
December 31, 2005. And even if it were relevant circumstantial
evidence, it would be significantly less probative than the
direct evidence of Emrich's liver functioning before her DLI,
which the ALJ did expressly consider. (Id. at 41–42.)

Accordingly, the ALJ's failure to consider this opinion was
harmless because, even if the ALJ had explicitly considered the
opinion, it provided no legitimate basis for finding that Emrich
was disabled before her DLI.

### b. April 9, 2013 Opinion

Emrich's argument regarding Dr. Fulp's later opinion is
similarly unavailing. The ALJ explicitly assigned "little
weight" to Dr. Fulp's 2013 letter and provided the following
rationale in his decision:

> In the letter[,] Dr. Fulp stated that he did not see
> the claimant until 2008, but his partner, Dr. Sanjib
> Mohanty[,] initially saw the claimant in 2006. He
> noted that as long as the claimant had been followed
> in his group for hepatitis C, her depression was
> thought to be too severe to allow treatment of her
> hepatitis C. He further stated the claimant's history

suggested a chronic depression for many years and he saw no reason to suspect that this was not true. The doctor further stated that the fact that the claimant's depression has been so severe for the past 7 years was highly suggestive that her depression was severe enough to warrant disability status prior to January 1, 2003. He did not believe that the claimant had been able to work since January 1, 2003, though their group had only seen her since 2006. The undersigned notes that Dr. Fulp had undoubtedly based his opinion on the claimant's description of her condition and not the actual notes from her treating psychiatrist. Further, Dr. Fulp is not a psychiatrist and did not see the claimant until sometime in 2006.

(Id. at 44; see id. at 1298.)

Emrich acknowledges that an ALJ may "disregard a retrospective medical opinion by a treating physician if there is contradictory evidence derived from contemporaneous clinic findings or the physician's own treatment records." (Doc. 17 at 4.) However, she argues that "[t]he ALJ in this case never identifies any contemporaneous contradictory evidence." (Id. at 5.) Additionally, Emrich contends that it was "logically inconsistent to give [Dr. Fulp's] narrative opinion little weight because he did not begin treating Emrich until after the DLI but then give substantial weight to a checklist form completed after the DLI by a nontreating[,] nonexamining medical consultant." (Id. at 6.)

Emrich's arguments construe the criteria for evaluating opinion evidence too narrowly. In reality, Emrich merely disagrees with the way in which the ALJ weighed the evidence.

But when this court reviews for substantial evidence, it should not "undertake to re-weigh conflicting evidence" or "substitute its judgment" for the Commissioner's.  <u>Mastro</u>, 270 F.3d at 176 (brackets omitted).

Under 20 C.F.R. § 404.1527(c), better known as the "treating physician rule," an ALJ generally must give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

However, the rule recognizes that the nature and extent of each treatment relationship may temper the weight an ALJ affords it, as may the supportability of the opinion and the specialization of the treating source.  <u>Id.</u>  Where, as here, a treating source's opinion is not given controlling weight, the ALJ must consider the factors set out in § 404.1527(c) in determining what weight, if any, to assign that opinion.  In the present case, the ALJ clearly followed these guidelines with regards to Dr. Fulp's area of specialty and the nature and supportability of his 2013 opinion.

First, § 404.1527(c)(5) explains that an ALJ must

"generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." A related subsection, § 404.1527(c)(2)(ii), describes how the nature and extent of the treatment relationship may affect the weight given an opinion:

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

Applying this guidance to the evidence at hand, it is clear that Dr. Fulp's specialty, hepatology, renders his opinion on the nature and extent of Emrich's depression less "weighty" than the findings of a psychiatrist or other mental health professional. The ALJ identified Dr. Fulp's lack of expertise in this area when assigning less weight to his opinion, along with the physician's lack of any objective medical basis for his conclusions. (Tr. at 44.) The importance of objective support, mentioned in passing in § 404.1527(c)(2)(ii), becomes more explicit in § 404.1527(c)(3), which provides that "[t]he more a

medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." Here, Dr. Fulp merely found that Emrich's "history suggests a chronic depression for many years" which was "highly suggestive" of depression severe enough to "warrant disability status" prior to Emrich's DLI. (Tr. at 1298.)[5] The ALJ therefore reasonably inferred that Dr. Fulp "based his opinion on the claimant's description of her condition and not the actual notes from her treating psychiatrist." (Id. at 44.)

Emrich makes no argument to the contrary. Instead, she highlights the ALJ's (1) failure to identify any inconsistent, contemporaneous evidence and (2) reliance on one other piece of post-DLI evidence. However, as set out above, inconsistency is one, but certainly not the only, basis for assigning less weight to a medical opinion. As for Emrich's second contention, the Commissioner correctly counters that Dr. Hoyt, a non-treating, non-examining medical consultant, issued her 2010 opinion as to Emrich's physical limitations, which were within her area of medical expertise. (Doc. 19 at 12 (citing Tr. at 695–702).) Dr. Hoyt reviewed all of the medical evidence in the record

---

[5]   Opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Social Security Act are never accorded controlling weight because the decision on that issue is dispositive and reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

before she gave her expert opinion, and she displayed an understanding of the evidentiary requirements of disability claims, all of which are factors for weighing opinion evidence under 20 C.F.R. § 404.1527(c).

Moreover, Emrich argues that the ALJ gave little weight to Dr. Fulp's 2013 opinion because it was retrospective, his treatment occurring after the DLI. (Doc. 17 at 4.) This is simply not true. Unlike in Bird, the ALJ did not deem Dr. Fulp's 2013 opinion irrelevant or otherwise refuse to consider it. The ALJ rejected it on the grounds noted above, i.e., being based on Emrich's subjective descriptions of her psychiatric condition and given by a physician on an area outside his area of expertise. (Tr. at 44.)

Accordingly, the court concludes that the ALJ weighed Dr. Fulp's opinion in a manner consistent with both the treating physician rule and the substantial evidence in this case.

### 3. GAF Scores

Finally, Emrich contends that the ALJ erred by failing to evaluate the numerous GAF scores in the record as medical opinions. "GAF, or 'Global Assessment of Functioning,' scores represent a 'clinician's judgment of the individual's overall level of functioning.'" Clemins v. Astrue, No. 5:13cv47, 2014 WL 4093424, at *1 (W.D. Va. Aug. 18, 2014) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental

Disorders 32 (4th ed. 2000)).  A GAF score has "no direct legal
or medical correlation to the severity requirements of social
security regulations." Powell v. Astrue, 927 F. Supp. 2d 267,
273 (W.D.N.C. 2013) (citing Oliver v. Comm'r of Soc. Sec., 415
Fed. App'x 681, 684 (6th Cir. 2011)). "It is, instead, intended
to be used to make treatment decisions."  Powell, 927 F. Supp.
2d at 273 (citations omitted).  "However, even though a GAF
score is not determinative of whether a person is disabled under
SSA regulations, it may inform the ALJ's judgment." Kozel v.
Astrue, No. JKS-10-2180, 2012 WL 2951554, at *10 (D. Md. July
18, 2012) (finding that "[GAF scores] are only medical evidence
that informs the Commissioner's judgment of whether an
individual is disabled"); Howard v. Comm'r of Soc. Sec., 276
F.3d 235, 241 (6th Cir. 2002) (finding that, "[w]hile a GAF
score may be of considerable help to the ALJ in formulating the
RFC, it is not essential to the RFC's accuracy").

Notably, three months after the ALJ issued his decision in
this case, the SSA issued a directive clarifying the impact of
GAF scores on disability decisions.  It was important for the
SSA to clarify the use of GAF scores because the most recent
edition of the Diagnostic and Statistical Manual of Mental
Disorders ("DSM") abandoned the use of GAF scoring altogether.
Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental
Disorders 16 (5th ed. 2013) (abandoning use of GAF scoring "for

several reasons, including its lack of conceptual clarity . . . and questionable psychometrics in routine practice"). In Administrative Message 13066 (AM-13066), effective July 22, 2013, the SSA acknowledged that the DSM had abandoned use of GAF scoring and instructed ALJs that they should still consider GAF scores as opinion evidence in some circumstances. The SSA explained,

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by §§ 20 CFR 404.1527(c), 416.927(c), and SSR 06-03p, while keeping the following in mind:
> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.
> A GAF score is never dispositive of impairment severity.

AM-13066.

Although Emrich summarily argues that the ALJ failed to evaluate her GAF score "at all" in accordance with the above requirements (Doc. 17 at 13), even a cursory reading of the

decision reveals the opposite. The ALJ extensively discussed Emrich's GAF scores from the relevant period along with his reasons for discounting them:

Records from Dr. Crisp indicate that he treated the claimant from April 16, 2002 until March 2006 . . . . The doctor estimated the claimant's Global Assessment Functioning (GAF) scores ranging from 35 to 45 (Exhibit 22F, pages 1-6). However, Dr. Crisp's actual treatment records reflect that once the claimant began tapering off of methadone and although she had ups and down[s] due to various family situations, she began to feel better. In fact, in June 2003, he noted that the claimant had been "doing very well recently." The claimant had taken herself off of some of her medications and was "clearing up a little bit mentally." There were no reports of mood disturbance, no reports of panic and no report of suicidal ideation. However, the doctor noted that her GAF remained at 45. Again in September 2003, he noted that the claimant had recent [sic] had a little difficulty with menopausal associated depression. She was noted to continue to decrease her Methadone. Office notes in January 2004 indicate that the claimant was "doing quite well." She had weaned herself down to 70 mg of Methadone and actually lost about 40 pounds and seemed a bit more functional. In May 2004, the claimant indicated that she was serving as a substitute teacher, she had lost her mother, her daughter was hospitalized and treated for a psychiatric illness and her husband had a coronary stent placed, but that she was tolerating things reasonably well and the doctor noted that there was no evidence of psychosis and that the claimant was able to hear, understand and process the information given. However, Dr. Crisp still did not indicate that the claimant's GAF had improved, even in July 2005 when the claimant's diagnosis was amended from major depression to a mood disorder did Dr. Crisp change the claimant's GAF. In light of the above, it is reasonable to believe that the GAFs which indicate severe impairments in the areas of social and occupational functioning do not correlate to Dr. Crisp's office notes and that the claimant was functioning at a much higher level that [sic] one

would be led to believe by her GAF scores.

(Tr. at 43–44.)

Because the above discussion complies with AM-13066, Emrich's assertion to the contrary is baseless. Accordingly, the court finds no error.[6]

## III. CONCLUSION

For these reasons, therefore,

IT IS ORDERED that Emrich's motion for judgment reversing the Commissioner (Doc. 16) be DENIED, the Commissioner's motion for judgment on the pleadings (Doc. 18) be GRANTED, and this action is DISMISSED WITH PREJUDICE.

/s/   Thomas D. Schroeder
United States District Judge

March 2, 2015

---

[6] To the extent that Emrich complains the ALJ ignored Dr. Young's assessment of her GAF score (Tr. at 44, 1163), the ALJ clearly assigned weight to her overall medical opinion. Even assuming the ALJ should have directly addressed the GAF score in Dr. Young's medical opinion, the score lacked meaningful probative value because it was for her mental condition in 2011, and the record already contained GAF scores for the actual pre-DLI period. Therefore, even if this were error, it was harmless and does not necessitate remand.